**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| **THE UNITED STATES OF AMERICA,** | |
| *v.* | **CRIMINAL NO. 1:25-CR-272-MSN** |
| **JAMES B. COMEY JR.,** | |
| ***Defendant.*** | |

### UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS INDICTMENT BASED ON VINDICTIVE AND SELECTIVE PROSECUTION

The United States of America, by and through the United States Attorney for the Eastern District of Virginia, hereby responds in opposition to Defendant's motion to dismiss the Indictment based on vindictive and selective prosecution. For the reasons stated herein, Defendant's motion should be denied and this case proceed to trial as the instant prosecution is neither vindictive nor selective.

# TABLE OF AUTHORITIES

*Cases*

*Blackledge v. Perry*,
   417 U.S. 21 (1974) .......................................................................................... 19, 25

*Bordenkircher v. Hayes*,
   434 U.S. 357 (1978) ........................................................................ 17, 23, 24, 27

*Casa De Maryland v. U.S. Dep't of Homeland Sec.*,
   924 F.3d 684 (4th Cir. 2019) ............................................................................ 17, 18

*Earley v. Champion Intern. Corp.*,
   907 F.2d 1077 (11th Cir. 1990) .......................................................................... 30

*Engquist v. Oregon Dep't of Agric.*,
   553 U.S. 591 (2008) ............................................................................................ 33

*Hartman v. Moore*,
   547 U.S. 250 (2006) ............................................................................................ 24

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ............................................................................................ 17

*Maddox v. Elzie*,
   238 F.3d 437 (D.C. Cir. 2001) ............................................................................ 25

*Marbury v. Madison*,
   5 U.S. (1 Cranch) 137 (1803) ............................................................................. 35

*Merritt v. Dillard Paper Co.*,
   120 F.3d 1181 (11th Cir. 1997) ..................................................................... 30, 31

*Naficy v. Ill. Dep't of Hum. Servs.*,
   697 F.3d 504 (7th Cir. 2012) .............................................................................. 30

*People v. Trump Organization, Inc.*,
   No. 451685/2020, 2022 WL 489625 (N.Y. Sup. Ct. Feb. 17, 2022) ................. 24

*SAS Assoc. 1, LLC v. City Council for Chesapeake*,
   91 F.4th 715 (4th Cir. 2024) ............................................................................... 33

*United States v. Adams*,
   832 F. Supp. 1138 (W.D. Tenn. 1993) ............................................................... 21

*United States v. Adams*,
   870 F.2d 1140 (6th Cir. 1989) ......................................................... 21

*United States v. Armstrong*,
   517 U.S. 456 (1996) ............................................................... passim

*United States v. Batchelder*,
   442 U.S. 114 (1979) ..................................................................... 17

*United States v. Biden*,
   729 F. Supp. 3d 410 (D. Del. 2024) ............................................ 31, 37

*United States v. Chamberlain*,
   225 F.3d 655 (4th Cir. 2000) .......................................................... 41

*United States v. Cooper*,
   617 F. App'x 249 (4th Cir. 2015) .................................................... 21

*United States v. Derrick*,
   163 F.3d 799 (4th Cir. 1998) ..................................................... 41, 42

*United States v. Doty*,
   832 F. App'x 174 (4th Cir. 2020) .................................................... 27

*United States v. Falk*,
   497 F.2d  (7th Cir. 1973) ............................................................... 39

*United States v. George*,
   No. 91-cr-0521, 1992 WL 121381 (D.D.C. May 18, 1992)................... 35

*United States v. Gilbert*,
   266 F.3d 1180 (9th Cir. 2001) ........................................................ 21

*United States v. Gomez-Lopez*,
   62 F.3d 304 (9th Cir. 1995) ..................................................... 20, 27

*United States v. Goodson*,
   204 F.3d 508 (4th Cir. 2000) .......................................................... 41

*United States v. Goodwin*,
   457 U.S. 368 (1982) ............................................................... passim

*United States v. Greene*,
   697 F.2d 1229 (5th Cir. 1983) ................................................... 39, 40

*United States v. Haggerty*,
   528 F. Supp. 1286 (D. Colo. 1981) ................................................. 39

*United States v. Haldeman*,
    559 F.2d 31 (D.C. Cir. 1976) .................................................................................. 35

*United States v. Hastings*,
    126 F.3d 310 (4th Cir. 1997) ..................................................................... passim

*United States v. Hoover*,
    727 F.2d 387 (5th Cir. 1984) ................................................................................ 39

*United States v. Joya-Martinez*,
    947 F.2d 1141 (4th Cir. 1991) ............................................................................. 35

*United States v. Koh*,
    199 F.3d 632 (2d Cir. 1999) ........................................................................... 19, 20

*United States v. Lazzaro*,
    No. 21-CV-0173 (PJS/DTS), 2022 WL 17417970 (D. Minn. Oct. 12, 2022); 2022 WL
    16948157 (D. Minn. Nov. 15, 2022) ............................................................... 24, 25

*United States v. Lee*,
    106 U.S. 196 (1882) ..................................................................................... 35, 36

*United States v. Lindh*,
    212 F. Supp. 2d 541 (E.D. Va. 2002) ................................................. 36, 37, 39, 40

*United States v. Meyer*,
    810 F.2d 1242 (D.C. Cir. 1987) ............................................................................ 23

*United States v. Moore*,
    543 F.3d 891 (7th Cir. 2008) ................................................................................ 33

*United States v. Olvis*,
    97 F.3d 739 (4th Cir. 1996) ......................................................................... passim

*United States v. Raymer*,
    941 F.2d 1031 (10th Cir. 1991) ............................................................................ 25

*United States v. Ronald Lee*,
    906 F.2d 117 (4th Cir. 1990) ................................................................................ 41

*United States v. Safavian*,
    649 F.3d 688 (D.C. Cir. 2011) ....................................................................... 25, 35

*United States v. Spears*,
    159 F.3d 1081 (7th Cir. 1998) ....................................................................... 21, 23

*United States v. Steele*,
    461 F.2d 1148 (9th Cir. 1972) .............................................................................. 39

*United States v. Venable*,
   666 F.3d 893 (4th Cir. 2012) .................................................................... passim

*United States v. Walker*,
   514 F. Supp. 294 (E.D. La. 1981) .......................................................... 23, 24

*United States v. Weinberger*,
   No. 92-cr-0416, 1992 WL 700245 (D.D.C. Oct. 30, 1992) ....................... 35

*United States v. Wilson*,
   262 F.3d 305 (4th Cir. 2001) .................................................................... passim

*United States v. Woods*,
   305 F. App'x 964 (4th Cir. 2009) ................................................................ 25

*Wayte v. United States*,
   470 U.S. 598 (1985) ............................................................................... 18, 24

### Statutes

18 U.S.C. § 1001(a)(2) ................................................................................... 17

18 U.S.C. § 1505 ............................................................................................ 17

28 U.S.C. § 547(1) ......................................................................................... 17

### Constitutional Provisions

U.S. Const. art. II, § 3 .................................................................................... 17

### Other Authorities

Ballentine's Law Dictionary (3d ed. 1969) ................................................... 30

Black's Law Dictionary (12th ed. 2024) ....................................................... 27

*Justice Manual* § 9-27.260, (U.S. Dep't of Justice, [updated June 2023]) .... 24

*Vindicating Vindictiveness: Prosecutorial Discretion and Plea Bargaining, Past and Future*,
   123 Yale L.J. 1014 (2017) ......................................................................... 24

## INTRODUCTION

Defendant James B. Comey, Jr.'s motion to dismiss the indictment based on allegedly vindictive and selective prosecution should be denied.  Through a mix of news reports, social-media posts, and speculation, the defendant weaves a tale of what he calls "glaring constitutional violations" that resulted in his indictment for making a false statement to Congress and obstructing a Congressional investigation.   Def. Mem., Dkt. No. 59 at 1.  The Supreme Court has imposed a demanding standard on defendants arguing a prosecutor brought an indictment for reasons forbidden by the Constitution.  Such claims ask courts to exercise judicial power over a "special province" of the Executive and risk unnecessarily impairing the performance of a core executive constitutional function.  When the rigorous legal standard is applied to the facts here, it is clear that the defendant has failed to show the Constitution requires the Court to take the extraordinary step of dismissing this case.

The prosecution is not vindictive.  The defendant has not produced "direct evidence" of a vindictive motive.  And he has not shown that the prosecutor pursued this case "solely to punish" him for exercising his First Amendment rights.  So he has not carried his heavy burden of establishing vindictive prosecution.

The prosecution is also not selective.  The defendant has not identified similarly situated individuals who were not prosecuted.  And he has not provided evidence that the decision to prosecute him was made because of his protected activities.  He has not produced the "clear evidence" required for dismissing an indictment based on selective prosecution.

1

A duly appointed and unbiased prosecutor presented the indictment. And a duly constituted grand jury found probable cause that he committed the indicted offenses. The motion to dismiss and request for discovery should be denied, and the case should proceed to trial.

## I.    BACKGROUND

### A.    The defendant's service as FBI Director and the Midyear Exam investigation.

The defendant served as Director of the Federal Bureau of Investigation from September 2013 until May 2017, when the President fired him.

In July 2015, the FBI opened an investigation referred to as the Midyear Exam. The Midyear Exam investigation was focused on former Secretary of State Hillary Clinton's use of a private email server to conduct official government business. The primary crime under investigation was the mishandling of classified information and failure to report the mishandling of classified information. *See* Gov. Ex. 1 at i (July 2018 Department of Justice Office of Inspector General (OIG) Report executive summary).

By the spring of 2016, the defendant "and the Midyear team had determined that, absent an unexpected development, evidence to support a criminal prosecution of Clinton was lacking." *See id.* at iii. The OIG found that, despite having conversations with the then-Deputy Attorney General regarding the joint announcement of a decision to decline criminal prosecution, the

defendant "began considering the possibility of an FBI-only public statement in late April and early May 2016. *See id.* at iv. The defendant stated that an FBI-only public statement was "warranted by the '500-year flood' in which the FBI found itself." *See id.* Of note, the timing and presumption that Clinton would eventually be the Democratic Party nominee for President was part of the defendant's decision-making process. *See id.* The defendant eventually "made a conscious decision not to tell [DOJ] leadership about his plans to make a separate statement because he was concerned that they would instruct him not to do it." *See id.* at v. The defendant "concealed his intentions from the [DOJ]" regarding his decision to independently make a declination announcement. *See id.*

On July 5, 2016, the defendant made a public statement in which he "announced that the FBI had completed its Midyear investigation, criticized Clinton and her senior aides as 'extremely careless' in their handling of classified information, stated that the FBI was recommending that the [DOJ] decline prosecution of Clinton, and asserted that 'no reasonable prosecutor' would prosecute Clinton based on the facts developed by the FBI during its investigation."[1] *See id.* at vi. The OIG determined that the defendant's "decision to make this statement was the result of his belief that only he had the ability to credibly and authoritatively convey the rationale for the decision to not seek charges against Clinton, and that he needed to hold the press conference to protect the FBI and the [DOJ] from the extraordinary harm that he believed would have resulted had he failed to do so." *See id.*

---

[1] The defendant contacted DOJ leadership "about his plans to make a public statement," but he did "so only after the FBI had notified the press," so as to "make it impracticable for [DOJ] leadership to prevent him from delivering his statement." *See* Gov. Ex. 1 at v. That behavior, the OIG determined, was "extraordinary and insubordinate." *See id.*

But, just two months later in September of 2016, an unrelated investigation out of the FBI's New York Field Office discovered potentially thousands of new emails relevant to Midyear Exam. *See id.* at vi. As a result, on October 28, 2016, the defendant sent a letter to the chairmen of various Congressional committees regarding the newly discovered information and the possible relevance to Midyear Exam. *See* Gov. Ex. 2 (Oct. 28, 2016 letter). He wrote that the FBI would "take appropriate investigative steps designed to allow investigators to review these emails to determine whether they contain[ed] classified information, as well as to assess their importance to [the FBI's] investigation." *Id.*

**B.    The defendant's correspondence with Daniel Richman—and Richman's correspondence with the press—regarding the Midyear Exam investigation.**

After the defendant sent the October 2016 letter the defendant emailed extensively with Daniel Richman, a Columbia Law School professor who also served as an FBI Special Government Employee since 2015.[2] Much of the correspondence occurred via the defendant's use of a personal email account and Mr. Richman's use of an email account associated with Columbia University.

For example, one day after the defendant sent the October 28 letter, Mr. Richman emailed the defendant regarding the letter. Mr. Richman wrote: "*Make sure you keep your eyes shut.* The

---

[2] In early 2015, while discussing potential opportunities at the FBI with FBI personnel, Mr. Richman represented that he "regularly g[o]t contacted by journalists -- particularly the NYTimes, Wall St J and Financial Times -- to explain things, and they often end up quoting me. Obviously, I would not plan to say anything -- on or off the record -- about matters I work on for the Bureau." *See* Gov. Ex. 3 (Jan. 2, 2015 email).

Mr. Richman further stated that "[t]he only issue (that [he could] think of) is whether [he] c[ould] keep up [his] public profile as a Columbia academic," which, he said, was "good for the school" and, in his "humble opinion, ma[de] criminal justice coverage slightly more accurate than it would otherwise be." *See id.*

country can't seem to handle your finding stuff." Gov. Ex. 4 (Oct. 29, 2016 emails) (emphasis added). The defendant[3] replied: "Thanks for the battling you have done against unreason. This is a strange time. B[u]t we press on." *Id.*

The next day, Mr. Richman sent the defendant an email regarding an op-ed he had been asked to write for *The New York Times* about the defendant's letter. Gov. Ex. 5 (Oct. 30, 2016 emails). Mr. Richman stated that he was "not inclined" to "write something," but that he would "do it" if the defendant thought it would "help things to explain that [the defendant] owed cong absolute candor," and that the defendant's "credibility w cong w[ould] be particularly important in the coming years of threatened cong investigations." *See id.* The defendant responded: "No need. At this point it would [be] shouting into the wind. Some day they will figure it out. And as [Individual 1 and Individual 2] point out, my decision will be one a president elect Clinton will be very grateful for (although that wasn't why I did it)." *See id.*

The defendant appears to have reconsidered that view shortly thereafter. On November 1, 2016, he emailed Mr. Richman, stating:

> When I read the times coverage involving [Reporter 1], I am left with the sense that they don't understand the significance of my having spoke about the case in July. It changes the entire analysis. *Perhaps you can make him smarter.*
>
> Let's imagine the Times had a policy against writing new articles close to elections if the articles might influence the election. Consistent with that policy they would avoid writing this week if sources told them that the FBI was looking at Huma Abedin's emails.
>
> But let's imagine that they wrote a very high profile piece in July that sources lead them to now conclude was materially inaccurate. Would they correct it or stay silent because they have a policy to avoid action near elections?
>
> I suspect they would quickly conclude that either course is an "action" and the choices are either reporting or concealing but there is no longer a "neutral" option

---

[3] The investigation has established that the defendant previously used the email "reinholdniebuhr7@gmail.com."

because of the reporting in July.  I also suspect they would resolve very quickly to choose the action of disclosing because to remain silent is to actively mislead, which has a wide range of very bad consequences.

*Why is this so hard for them to grasp?*  All the stuff about how we were allegedly careful not to take actions on cases involving other allegations about which we have never spoken is irrelevant.  I love our practice of being inactive near elections.  But inactivity was not an option here.  The choices were act to reveal or act to conceal.

*See* Gov. Ex. 6 (Nov. 1–2, 2016 emails) (emphases added).

Mr. Richman responded the next day, stating: "This is precisely the case I made to them and thought they understood.  I was quite wrong.  Indeed I went further and said mindless allegiance to the policy (and recognition that more evidence could come in) would have counseled silence in july to let hrc twist in the wind."  *See id.*  Mr. Richman emailed the defendant shortly thereafter, writing, "Just got the point home to [Reporter 1].  Probably was rougher than u would have been."  *See id.*

The defendant emailed Mr. Richman shortly thereafter, entitling the message "Pretty good" and sending a link to a *New York Times* piece regarding the defendant's purported options in late October 2016 concerning the Clinton email investigation (Midyear Exam).  *See* Gov. Ex. 7 (Nov. 2, 2016 email chain); Matt Apuzzo and Sergio Peçanha, *These Are the Bad (and Worse) Options James Comey Faced*, N.Y. Times (Nov. 2, 2016).[4]  The defendant wrote: "*Someone showed some logic.  I would paint the cons more darkly but not bad.*"  *See* Gov. Ex. 7 (emphasis added).  Mr. Richman responded: "See I *can* teach."  *See id.*  The defendant replied: "*Well done my friend. Who knew this would. E so uh fun.*"[5]  *See id.* (emphasis added).

---

[4]  https://www.nytimes.com/interactive/2016/11/02/us/elections/James-Comey-options-classified-information-Hillary-Clinton-elections.html.

[5]  The article describes, among other things, the defendant's purported options following his October 2016 letter to Congress.  Notably, one ostensible option was for him to "[a]nonymously (Continued)

Similarly, in April 2017, the defendant emailed Mr. Richman apparently regarding a lengthy article in *The New York Times*—in which Mr. Richman was a named source—regarding the Clinton email investigation (Midyear Exam). *See* Gov. Ex. 8 (Apr. 23, 2017 email chain). The defendant wrote that he had "read [t]he piece. Thanks so much for your words and tell [Reporter 1] he did a good job. Would be different if I wrote it but it is by and large fair." *See id.* Mr. Richman replied: "You're ever so welcome. And will do re [Reporter 1]. Any badly or under-developed points for me to work on with the New Yorker? Or just the usual." *See id.*

Consistent with the above-described correspondence, Richman corresponded extensively with members of the media regarding or on behalf of the defendant, including in an anonymous capacity.

For example, in February 2017, Richman emailed Individual 3, a then-government official who had served in high-ranking positions at the FBI and DOJ. Mr. Richman wrote: "Hi [Individual 3] - my pal at the NYT, [Reporter 1] is (along with [Reporter 2], [Reporter 3], and (gag me) [Reporter 4]) is doing a huge piece on the HRC emails. *He's had a ton of background conversations with players and non-players (like me).* [Reporter 1] very much would like to talk to you exclusively on background as he tries to understand[] Jim's decision making to the extent possible. [Reporter 1] asked me to reach out to you. Hence this email. Would you be willing to chat with him?" *See* Gov. Ex. 9 (Feb. 11, 2017 email chain) (emphasis added). Individual 3 replied in the affirmative and stated that he would "reach out" to the reporter. *See id.*

---

leak the preliminary findings [concerning the review of the emails] before Election Day." Apuzzo & Peçanha, *supra* at 6. The article does not appear to have named Mr. Richman as a source.

Mr. Richman also corresponded with Reporter 1 via text message shortly after the defendant's termination as FBI Director.  Over a period of days beginning on May 11, 2017, the pair texted:

> REPORTER 1:  And wanted to push you to push JBC.  My sense from his texts is that he wants this to spill.

> RICHMAN:  OK.  You text him and I will reach out too.  Just ask for the approx [date] and clearance for me to talk as anon source

> ***

> REPORTER 1:  When you reach out to him tell him that you just need for him to allow you to talk. work your magic

> ***

> REPORTER 1:  This is the message I sent him [the defendant]

> REPORTER 1:  I don't want to bother you as I wait to hopefully learn more about this tease.  I do think you deserve to be left to catch your breath but we're at too important a time in the story and the country's history for me to leave you alone.  I have to try and throw everything I can against the wall.  Questions of your unwillingness to give the president your loyalty are already out there.  You don't even need to talk to me.  Just give Richman green light to tell me about dinner. That's all..

> ***

> RICHMAN:  Just got goahead [*sic*].  See my email

> ***

> RICHMAN:  A source close to jim is now telling you that jim very much looks forward to giving public testimony before congress (vs the closed testimony sought next week)

> ***

> REPORTER 1:  Turn off your phone

> REPORTER 1:  I'm going to put this in a story and then tweet it out and people may start bothering you

> REPORTER 1:  Sleep well

> RICHMAN:  Ok.  But I'm just an unnamed associate, right?  Nite nite

> REPORTER 1:  Yes yes

*See* Gov. Ex. 10 (May 2017 text messages).

  **C.**  **The defendant's disclosure of memoranda concerning meetings with the President and his pertinent Senate testimony.**

  On May 3, 2017, while still the FBI Director, the defendant testified in an FBI oversight hearing before the Senate Judiciary Committee. He engaged in the following colloquy with Senator Grassley:

> SENATOR GRASSLEY: Director Comey, have you ever been an anonymous source in news reports about matters relating to the Trump investigation [the FBI's Crossfire Hurricane investigation] or the Clinton investigation?
>
> COMEY: Never.
>
> SENATOR GRASSLEY: Question two on relatively related, have you ever authorized someone else at the FBI to be an anonymous source in news reports about the Trump investigation or the Clinton investigation?
>
> COMEY: No.

*See* Def. Mem., Dkt. No. 59-2 at 4–5 ("Senator" added).[6]

  On May 9, the defendant was fired. Days later, the defendant sent copies of four of seven memoranda he had drafted between January and April 2017 purportedly summarizing one-on-one interactions that he had with President-elect and the President to one of his personal attorneys, Patrick Fitzgerald.[7] *See* Gov. Ex. 11 at 1, 13 (Aug. 2019 Department of Justice OIG Report).

---

[6] The transcript attached to the defendant's motion non-substantively corrects Senator Grassley's second question. *See* C-Span, *User Clip: Sen. Grassley Questions James Comey* (May 3, 2017), https://www.c-span.org/clip/senate-committee/user-clip-sen-grassley-questions-james-comey/4853218.

[7] The defendant "told the OIG that the day after his removal, or very shortly thereafter, he retained attorneys Patrick Fitzgerald, David Kelley, and Daniel Richman to provide advice and counsel in connection with [his] termination as FBI Director and any post-termination legal issues that might arise." *See* Gov. Ex. 11 at 33 (citation modified).

(Continued)

The defendant also asked Mr. Richman to share the contents of one of those memoranda with a reporter at *The New York Times*.  Mr. Richman did.  *See id.* at 13; *see also id.* at 2, 39–41. The defendant later told the OIG that he "didn't consider what he asked Richman to do privileged," and that he "didn't intend to assert any kind of privilege about the direction to Richman."  *See id.* at 50 (citation modified).  When asked whether he was acting "as Comey's attorney or as Comey's friend by contacting the reporter," Mr. Richman told the OIG that "it was both," and that "while one could imagine situations where parsing of that sort was necessary, Richman never found those occasions arose."  *See id.* at 41 (alteration omitted).

In June 2017, the defendant testified before the Senate Select Committee on Intelligence and "answered a number of questions from Senators concerning the creation, handling, and sharing of the [memoranda]."  *See id.* at 49.  He engaged in the following colloquy with Senator Collins:

> SENATOR COLLINS:  And finally, did you show copies of your memos to anyone outside the Department of Justice?
>
> COMEY:  Yes.
>
> SENATOR COLLINS:  And to whom did you show copies?

---

The defendant sent copies of four memoranda—the second, fourth, and sixth, as well as a redacted copy of the seventh—to Mr. Fitzgerald.  *See id.* at 13.  Mr. Fitzgerald subsequently forwarded them to Mr. Richman and Mr. Kelley, *see id.* at 1, 13, and the defendant also sent Mr. Richman a digital photograph of the fourth memorandum.  *See id.* at 13.

Mr. Fitzgerald also forwarded the defendant's email and the memoranda to another email account belonging to Mr. Fitzgerald and saved material sent by the defendant to his own computer.  *See id.* at 38.

The FBI—which determined that the second memorandum sent by the defendant contained classified information, *see id.* at 1—subsequently had to remove or delete the memoranda from the computer systems of Mr. Fitzgerald, Mr. Kelley, and Mr. Richman.  *See id.* at 14.  The defendant never informed the FBI that he had shared the memoranda with them; instead, the FBI first learned that information from Mr. Richman.  *See id.* at 49, 59.

> COMEY:  I asked—the president tweeted on Friday [May 12], after I got fired, that I better hope there's not tapes.  I woke up in the middle of the night on Monday night, because it didn't dawn on me originally that there might be corroboration for our conversation.  There might be a tape.
>
> And my judgment was, I needed to get that out into the public square.  And so I asked a friend of mine to share the content of the memo with a reporter.  Didn't do it myself, for a variety of reasons.  But I asked him to, because I thought that might prompt the appointment of a special counsel.  And so I asked a friend of mine to do it.
>
>            ***
>
> SENATOR COLLINS:  Who was that?
>
> COMEY:  A good friend of mine who's a professor at Columbia Law School.

See *id.* (bracketing in original; "Senator" added); *see also id.* at 50 (noting that the defendant referred to Mr. Richman "as his 'friend' rather than his attorney").[8]

In September 2020, the defendant again testified before the Senate Judiciary Committee. During the defendant's testimony, he engaged in the following colloquy with Senator Cruz:

> SENATOR CRUZ:  All right.  Let's shift to another topic.  On May 3, 2017 in this committee, Chairman Grassley asked you point blank 'have you ever been an anonymous source in news reports about matters relating to the Trump investigation or Clinton investigation?'  You responded under oath 'never.'  He then asked you 'have you ever authorized someone else at the FBI to be an anonymous source in news reports about the Trump investigation or the Clinton administration.'  You responded again under oath, 'no.'"
>
> Now, as you know, Mr. McCabe, who works for you, has publicly and repeatedly stated that he leaked information to The Wall Street Journal and that you were directly aware of it and that you directly authorized it.  Now, what Mr. McCabe is saying and what you testified to this committee cannot both be true; one or the other is false.  Who's telling the truth?
>
> COMEY:  I can only speak to my testimony.  *I stand by what, the testimony you summarized that I gave in May of 2017.*

---

[8] The OIG "provided [its] factual findings" to the Department of Justice "for a prosecutorial decision regarding Comey's conduct," and, "[a]fter reviewing the matter, the Department declined prosecution."  *See* Gov. Ex. 11 at 52.

SENATOR CRUZ:  So, your testimony [is] [] you've never authorized anyone to leak.  And Mr. McCabe if he says contrary is not telling the truth, is that correct?

COMEY:  Again, I'm not going to characterize [McCabe's] testimony, but *mine is the same today*.

*See* Def. Mem., Dkt. No. 59-3 at 11 (emphases added; "Senator" added).[9]

### D.    The President's concern with the defendant's official conduct.

Shortly after the defendant was fired, the President began to publicly express his concern that the defendant had leaked (or authorized the leak of) investigative information and had given false or misleading testimony to cover it up.  For example, on May 31, 2017, he referenced "the false or misleading testimony by James Comey."  Def. Mem., Dkt. No. 59-4 at 2.  On June 9, he posted, "Comey is a leaker!"  *Id.*  Two days later, he posted, "I believe the James Comey leaks will be far more prevalent than anyone ever thought possible.  Totally illegal?"  *Id.*  In July, he reposted a news report stating, "Report accuses material James Comey leaked to a friend contained top secret information."  *Id.*  In October 2017, he posted that "James Comey lied and leaked and totally protected Hillary Clinton."  *Id.* at 3.  In March 2018, the President posted, "Wow, watch Comey lie under oath to Senator G when asked 'have you ever been an anonymous source … or known someone else to be an anonymous source…?'  He said strongly 'never, no.'  He lied as shown clearly on @foxandfriends."  *Id.* at 6.

---

[9] The transcript attached to the defendant's motion non-substantively corrects Senator Cruz's questions and the defendant's first answer; the transcript also erroneously adds the word "that" to Senator Cruz's final question and omits the word "is" from the same question.  *See, e.g.*, POLITICO, *Archive: Sen. Ted Cruz questions James Comey on Trump and Clinton investigation leaks* (Sept. 26, 2025), https://www.politico.com/video/2025/09/26/archive-sen-ted-cruz-questions-james-comey-on-trump-and-clinton-investigation-leaks-1759922.

The President continued to express this sentiment throughout his first term. For example, in September 2018, the President quoted a law professor who said, "You know who's at fault for this more than anyone else, Comey, because he leaked information and laundered it through a professor at Columbia Law School. Shame on that professor, and shame on Comey." *Id.* at 16.[10]

The defendant has cited no comments about him from President Trump between December 2020 and August 2022. *See id.* at 41–42. Over the course of his 2024 campaign, President Trump continued to post references to the defendant's conduct as FBI Director, including his handling of the Midyear Exam investigation and the resulting OIG investigation. *Id.* at 44–50.

### E.    The defendant's public posts about President Trump.

On the defendant's part, his motion shows his first social-media post speaking out about the Trump administration (not the President directly) came in June 2017, over a month after he was fired—and after the President had publicly posted about his "false or misleading testimony." *Id.* at 2. There is no evidence of the defendant criticizing the President himself until April 16, 2018, when he called the President "morally unfit to be president." *Id.* at 7. At that point, the President had clearly and repeatedly maintained that the defendant had authorized the leak of investigative information and lied to cover it up. *See id.* at 2–7.

The defendant opined that the President should not be reelected sporadically in 2018. *Id.* at 13, 14, 16, 18–19. He did so more often in the leadup to the 2020 election. *Id.* at 20–41. In 2021, the defendant called President Trump "a menace" and "very bad person" in a flurry of posts.

---

[10] *See also* Ian Schwartz, *Dershowitz: Comey Leaked, Laundered Info Through Columbia Professor to Launch an Investigation*, RealClear Politics (Sept. 12, 2018), https://www.realclearpolitics.com/video/2018/09/12/dershowitz_comey_leaked_laundered_info_through_columbia_professor_to_launch_an_investigation.html?spotim_referrer=social_rail#.

*Id.* at 41.  He then advocated against re-electing President Trump fewer than 10 times between May 2023 and November 2024.[11]  *Id.* at 48.

### F.    Law enforcement's investigations into unauthorized public disclosures.

In the spring of 2025, a team of FBI investigators was assembled to examine possible reform of policies, procedures, compliance, and culture at the FBI.  *See* Gov. Ex. 12.  During their work, FBI investigators were alerted to a seemingly unused SCIF in FBI headquarters (Room 9582) containing a random collection of classified documents.  *Id.*  A large majority of the documents were on the floor in five burn bags.  *Id.*  Room 9582 was then subject to an inventory for the documents that were located inside. *Id.*  Investigators located hundreds of pages relating to Crossfire Hurricane (2016 FBI investigation of alleged ties between President Trump's campaign and Russia) and the then-classified appendix to the 2016 Durham Special Counsel Report (now partially declassified).  *Id.*  Additionally, inside a locked safe within Room 9582, investigators located copies of handwritten notes of the defendant when he was the Director of the FBI. *Id.*; *See* Gov. Ex. 13 (Defendant's handwritten notes). Defendant's handwritten notes were not known to any prior investigative teams.

The investigative team reviewed access logs for Room 9582.  *See* Gov. Ex. 12. The access logs showed an extended period of dormancy, where Room 9582 was rarely if ever accessed. *Id.*  Then, in late-December of 2024, access to Room 9582 began to pick up with a spike of activity occurring over the inauguration weekend (January 19 to 22, 2025).  *Id.*

---

[11] The government recognizes that the defendant and the President likely made public statements apart from their social-media posts.  But the defendant bears the burden of proof on his vindictive- and selective-prosecution claims, so this response addresses only the evidence he has produced.

The discovery of the handwritten notes is relevant considering the defendant's prior testimony on September 30, 2020. Of note, during that hearing, the defendant was questioned by Senator Graham of South Carolina and Senator Hawley of Missouri.  *See* Gov. Ex. 14.  The questions focused on whether the defendant remembered "being taught" of "U.S. presidential candidate Hillary Clinton's approval of a plan concerning U.S. presidential candidate Donald Trump and Russian hackers hampering U.S. elections as a means of distracting the public from her use of a private email server." *See id.*  The defendant responded by stating that "it doesn't ring any bells with me" and "I don't know what that refers to" and "I don't remember receiving anything that is described in that letter." *See id*. at 1 and 5.  Despite this testimony, the defendant's handwritten notes dated September 26, 2016, read: "HRC plan to tie Trump." *See* Gov. Ex. 13 (Defendant's handwritten notes).

### G.    Appointment of U.S. Attorney Halligan and the indictment.

On August 13, 2025, the President posted a link to a Fox News segment with the text, "DOCUMENTS REVEAL JAMES COMEY ASSOCIATE LEAKED CLASSIFIED INFORMATION TO THE NYT."  Donald J. Trump (@realDonaldTrump), TruthSocial (Aug. 13, 2025 at 12:42 ET).[12]  The next day, he posted a link to a news article discussed in the segment. Donald J. Trump (@realDonaldTrump), TruthSocial (Aug. 14, 2025 at 7:02 ET).[13]  The article detailed FBI documents recently disclosed to Congress and indicated that Richman had admitted "that he was given access by Comey to what turned out to be highly classified information up to the SCI level and sometimes provided information to reporters on an anonymous basis."  John

---

[12] https://truthsocial.com/@realDonaldTrump/posts/115022453383517920.

[13] https://truthsocial.com/@realDonaldTrump/posts/115026776769476976.

Solomon and Jerry Dunleavy, *Comey's media mole told FBI he shaped Russia narrative, needed 'discount' to deny leaking intel*, Just the News (Aug. 12, 2025).[14]

On September 20, 2025, the President posted:

> Pam: I have reviewed over 30 statements and posts saying that, essentially, "same old story as last time, all talk, no action. Nothing is being done. What about Comey, Adam "Shifty" Schiff, Leticia??? They're all guilty as hell, but nothing is going to be done." Then we almost put in a Democrat supported U.S. Attorney, in Virginia, with a really bad Republican past. A Woke RINO, who was never going to do his job. That's why two of the worst Dem Senators PUSHED him so hard. He even lied to the media and said he quit, and that we had no case. No, I fired him, and there is a GREAT CASE, and many lawyers, and legal pundits, say so. Lindsey Halligan is a really good lawyer, and likes you, a lot. We can't delay any longer, it's killing our reputation and credibility. They impeached me twice, and indicted me (5 times!), OVER NOTHING. JUSTICE MUST BE SERVED, NOW!!! President DJT

Def. Mem., Dkt. No. 59-4 at 56.  The same day, the President announced his intention to nominate Ms. Halligan as U.S. Attorney for the Eastern District of Virginia.  Donald J. Trump (@realDonaldTrump), TruthSocial (Sept. 20, 2025 at 21:50 ET).[15]

To lead the office in the interim, on September 22, the Attorney General "designate[d] and appoint[ed] Lindsey Halligan to serve as the United States Attorney for the Eastern District of Virginia."  *See* Def. Mem., Dkt. No. 59-1.

On September 25, in response to a reporter's question about a potentially imminent indictment of the defendant, the President said:

> I can't tell you what's going to happen because I don't know yet.  Very professional people, headed up by the Attorney General, [Deputy Attorney General] Todd Blanche and [U.S. Attorney] Lindsey Halligan . . . they're going to make a determination.  I'm not making that determination.  I think I'd be allowed to get involved if I want, but I don't really choose to do so.

---

[14] https://justthenews.com/government/federal-agencies/comey-media-mole-admitted-fbi-he-shaped-russia-narrative-needed.

[15] https://truthsocial.com/@realDonaldTrump/posts/115239776714791650.

*See* Alex Gangitano, *Trump says he doesn't know if Comey will be indicted*, The Hill (Sept. 25, 2025).[16]

Later that day, a grand jury charged the defendant with violations of 18 U.S.C. § 1001(a)(2) and 18 U.S.C. § 1505 based on his September 2020 Congressional testimony.  Indictment, Dkt. No. 1.

## II.    ARGUMENT

The President has a responsibility to "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 3.  And the U.S. Attorneys help him discharge this responsibility by prosecuting "offenses against the United States."  *See* 28 U.S.C. § 547(1).  To that end, a U.S. Attorney is tasked with deciding what offenses to prosecute in her district.  That decision is "the special province of the Executive Branch."  *Heckler v. Chaney*, 470 U.S. 821, 832 (1985).  So she enjoys "broad discretion" in making it.  *United States v. Goodwin*, 457 U.S. 368, 382 (1982).  Her discretion is—of course—not "unfettered"; she remains "subject to constitutional constraints." *United States v. Batchelder*, 442 U.S. 114, 125 (1979).  But the decision to prosecute otherwise "rests entirely in [her] discretion," *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978), and her decision is supported by a "presumption of regularity," *United States v. Armstrong*, 517 U.S. 456, 464 (1996).

The Executive Branch's discretion in this area "is deeply rooted in the Constitution's separation of powers."  *See Casa De Maryland v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 709–710 (4th Cir. 2019) (Richardson, J., concurring in part and dissenting in part).  The Executive Branch prosecutes offenses; the Judicial Branch adjudicates them.  If, instead, the Judicial Branch could decide which offenses to prosecute, that would "seriously risk[] individual liberty."  *Id.*  And

---

[16] https://thehill.com/homenews/administration/5521728-president-trump-comey-indictment/.

if the Judicial Branch could decide which offenses *not* to prosecute, "that would improperly divest the President . . . of the executive authority that the Constitution" grants him.  *Id.* at 710.  This separation of powers plays on the distinct talents of the different branches.  "[T]he decision to prosecute is particularly ill-suited to judicial review."  *Wayte v. United States*, 470 U.S. 598, 607 (1985).  Meanwhile, the Executive Branch is well equipped to assess an offense and "determine the extent of the societal interest in prosecution."  *See Goodwin*, 457 U.S. at 382.

The societal interests in this prosecution are readily apparent and overwhelming.  The defendant is a former FBI Director who lied to Congress about his conduct while at the helm of the Nation's primary federal law-enforcement agency.  His prosecution implicates societal interests of the highest order.  Nonetheless, he asks the Court to take the extraordinary step of dismissing his indictment because—he says—he is being vindictively and selectively prosecuted.  Given the deep-seated separation-of-powers principles at stake, his request can be granted only if "the Constitution requires it."  *See United States v. Olvis*, 97 F.3d 739, 743 (4th Cir. 1996).  It doesn't.  Therefore, "judicial intervention should not deny the community the benefit of a prosecution."  *See United States v. Wilson*, 262 F.3d 305, 317 (4th Cir. 2001).

### A.    The government is not vindictively prosecuting the defendant.

To establish a vindictive-prosecution defense, a defendant must carry a "heavy burden."  *Wilson*, 262 F.3d at 316.  He must show that his "prosecution 'could not be justified as a proper exercise of prosecutorial discretion.'"  *Id.* (quoting *Goodwin*, 457 U.S. at 380 n.12).  To do that, a defendant must prove two elements "through objective evidence."  *See id.* at 314.  First, that "the prosecutor acted with genuine animus" towards him.  *Id.*  Here, that requires "direct evidence" of a vindictive motive.  *Id.*  Second, that the prosecutor "pursued the . . . prosecution *solely* to punish him for exercising a protected right.  *Id.* at 316.

18

Because there are great costs to requiring the government to produce discovery related to a vindictive-prosecution defense, *see Armstrong*, 517 U.S. at 468; *see also Wilson*, 262 F.3d at 315–16, a defendant seeking such discovery must first "overcome a significant barrier by advancing objective evidence tending to show the existence" of the defense. *Wilson*, 262 F.3d at 315. It should be "rigorous" for a defendant to overcome this "significant barrier." *See id.* (quoting *Olvis*, 97 F.3d at 743).

The defendant argues that the evidence already on the record "alone" carries his heavy burden. Def. Mem., Dkt. No. 59 at 18. Not so. His evidence—a mix of news reports, social-media posts, and speculation—is hardly evidence at all. It certainly isn't "direct evidence" of a vindictive motive.[17] *Wilson*, 262 F.3d at 314. And it fails to show that the prosecution was brought "*solely*" to punish him for exercising a protected right. *Id.* at 316. The defendant has not carried the "heavy burden" required for dismissal or overcome the "significant barrier" to be entitled to

---

[17] Direct evidence is not always required. A defendant can sometimes show that his prosecution presents "circumstances from which an improper vindictive motive may be presumed." *See Wilson*, 262 F.3d at 314. Yet this so-called presumption of vindictiveness is narrowly circumscribed. It is proper only where "the circumstances 'pose a realistic likelihood of vindictiveness.'" *Id.* (quoting *Blackledge v. Perry*, 417 U.S. 21, 27 (1974)). That requires the circumstances to "warrant [the presumption] for all cases of the type presented," which is nearly impossible in a pretrial setting because of the "broad discretion given prosecutors and the wide range of factors that may properly be considered in making pretrial prosecutorial decisions." *Id.* at 315. For that reason, the presumption is "rarely, if ever," available to a defendant in a pretrial setting. *See id.*; *see also United States v. Koh*, 199 F.3d 632, 639–640 (2d Cir. 1999) (noting that the defendant who raised a vindictive-prosecution defense in a pretrial setting did not "base his claim on a presumption of vindictiveness, nor could he").

Even if the presumption can be drawn in the pretrial setting, however, it still requires the defendant to show that the circumstances are "sufficiently suggestive of vindictive prosecution that when similar circumstances are presentenced in other factual contexts, the same conclusion would be suggested." *Wilson*, 262 F.3d at 317–18. The defendant has not made that showing. Therefore, to the extent that the defendant requests a presumption of vindictiveness, *see* Def. Mem., Dkt. No. 59 at 38–40, he isn't entitled to it.

discovery. *Id.* at 315, 316. The Court should deny his motion to dismiss for vindictive prosecution and his request for discovery.

### 1. The defendant has not produced direct evidence of a vindictive motive.

The defendant must first produce "direct evidence" of the prosecutor's vindictive motive. *Wilson*, 262 F.3d at 314. That requires him to produce evidence that will rarely exist: "a statement by the prosecutor evidencing the vindictive motive." *See Koh*, 199 F.3d at 640. He has produced no such statement.

### a. The defendant has not even attempted to show direct evidence that the prosecuting U.S. Attorney had an improper vindictive motive.

To start, the relevant analysis is whether the "prosecutor charging" the offense "harbored vindictive animus." *Wilson*, 262 F.3d at 316; *see United States v. Gomez-Lopez*, 62 F.3d 304, 306 (9th Cir. 1995) (noting that the focus "is on the ultimate decision-maker"). Here, that prosecutor is the U.S. Attorney. Yet the defendant doesn't present any evidence that she harbors animus against him. Instead, he says that he doesn't need any such evidence because his claim "turns on the animus harbored by the official who prompted the prosecution." *See* Def. Mem., Dkt. No. 59 at 21. And, according to him, that is the President. *See id.* As discussed below, the President does not harbor vindictive animus against the defendant in the relevant sense. Before reaching that issue, however, the Court should determine whether the defendant has offered sufficient evidence to find that the President displaced the U.S. Attorney as "the ultimate decision-maker" in bringing this prosecution. *See Gomez-Lopez*, 62 F.3d at 304. The only "direct evidence" on the issue says otherwise. *See Wilson*, 262 F.3d at 314.

The defendant's argument relies on the imputed-animus theory. The Fourth Circuit has never adopted that theory. In fact, when a defendant asked the Fourth Circuit to impute animus

from investigating law-enforcement agents, the Fourth Circuit categorically rejected the theory. *See United States v. Hastings*, 126 F.3d 310, 314 (4th Cir. 1997) ("We will not impute the unlawful biases of the investigating agents to the persons ultimately responsible for the prosecution."); *see also United States v. Cooper*, 617 F. App'x 249, 251 (4th Cir. 2015). That is consistent with other circuits' application of the theory in that context. *See, e.g.*, *United States v. Gilbert*, 266 F.3d 1180, 1187 (9th Cir. 2001) ("In all but the most extreme cases, it is only the biases and motivations of the prosecutor that are relevant."); *United States v. Spears*, 159 F.3d 1081, 1087 (7th Cir. 1998).

When courts have entertained the imputed-animus theory in other contexts, they have required a significant evidentiary showing: there must be "evidence that the federal prosecutor did not make the ultimate decision to bring the indictment." *Spears*, 159 F.3d at 1087. The government is not aware of any case where that showing was met and a different party's animus was imputed to the prosecutor. Even in the defendant's primary case to support his argument, *United States v. Adams*, 870 F.2d 1140 (6th Cir. 1989), the Sixth Circuit did not impute animus to the prosecutor. *See id.* at 1146. It remanded for a factual determination as to whether there was evidence that the animus could be imputed. *Id.* And on remand, the district court held there had "not been a showing of realistic likelihood of vindictiveness." *United States v. Adams*, 832 F. Supp. 1138, 1151 (W.D. Tenn. 1993).

Consider *Wilson*, where even an explicit request for prosecution from the allegedly vindictive actor did not allow animus to be imputed. *See Wilson*, 262 F.3d at 316. There, the defendant had absconded from law enforcement while serving a sentence for a felon-in-possession conviction from the District of South Carolina. *See id.* at 309. Law enforcement and prosecutors from the District of South Carolina reviewed whether he could be prosecuted for escape. While that review was ongoing, the Fourth Circuit vacated the defendant's felon-in-possession

conviction. Then, days later, the U.S. Attorney for the District of South Carolina "sent an e-mail message to the U.S. Attorney for the Eastern District of North Carolina"—the proper venue for an escape prosecution—and "request[ed] that [the defendant] be prosecuted for escape." *Id.* at 310.

After the Eastern District of North Carolina brought an escape charge, the district court dismissed the indictment "on the ground that the prosecution was motivated by vindictiveness." *Id.* at 309. On appeal, the defendant argued that the U.S. Attorney for the District of South Carolina had vindictive animus that should be imputed to the Eastern District of North Carolina. *See id.* at 316. The Fourth Circuit disagreed. It reasoned that the explicit request for a prosecution amounted to "no evidence" showing that the animus "was somehow transferred." *See id.* Therefore, the defendant had not shown that the prosecutor "failed to act independently." *See id.* at 314.

The same is true here. The defendant's evidence that the U.S. Attorney "failed to act independently" is pure speculation. *See id.* In fact, the defendant in *Wilson* had more than the defendant does here: an explicit request for prosecution from the allegedly vindictive actor. Nonetheless, the defendant tries to work around this by requesting an expansive application of the imputed-animus theory. To do that, he notes that the allegedly vindictive actor in this case is "the head of the Executive Branch" who is the U.S. Attorney's "ultimate supervisor." Def. Mem., Dkt. No. 59 at 22. And that might be a legitimate distinction if the defendant had evidence that the President ordered his prosecution. But the defendant has not offered any such evidence. In fact, the only evidence on the question is the President's statement that he did *not* order the prosecution. *See* Gangitano, *supra* at 17; *Trump on Whether He's Using the DOJ to Punish His Foes*, Yahoo! News (Nov. 2, 2025) (Q: "Did you instruct the Department of Justice to go after them?" A: "No, and not in any way, shape, or form.").[18]

---

[18] https://www.yahoo.com/news/articles/retribution-norah-o-donnell-confronts-010654535.html.

For that reason, the defendant has not presented sufficient "evidence that [the U.S. Attorney] did not make the ultimate decision to bring the indictment." *See Spears*, 159 F.3d at 1087. That means he must present direct evidence of her animus. And he does not even try to make that showing. Nor could he. The Court's consideration of the vindictive-prosecution defense should stop there.

> **b.    The defendant has not shown direct evidence that the President had an improper vindictive motive.**

Should the Court decide that it needs to consider the President's alleged animus, the defendant has not carried his burden to present "direct evidence" that the President harbors animus in the relevant sense. The defendant primarily cites the President's social-media posts. These posts reflect the President's view that the defendant has committed crimes that should be met with prosecution. They may even suggest that the President disfavors the defendant. But they are not direct evidence of a vindictive motive.

In the context of a vindictive-prosecution defense, "vindictiveness" has a specific meaning. It refers to prosecutorial action "whose objective is to penalize a person's reliance on his legal rights." *See Bordenkircher*, 434 U.S. at 363. None of the President's social-media posts express a desire for the defendant to be penalized for exercising his First Amendment rights. Far from it. The President's social-media posts are clear on why he thinks the defendant should be prosecuted: he thinks the defendant is "guilty as hell." *See* Def. Mem., Dkt. No. 59-4 at 56; *see also id.* at 6 (stating that the defendant "lied under oath to Senator G"). That is not an expression of vindictiveness.

Start with the meaning of "prosecutorial vindictiveness." It is a "term of art with a precise and limited meaning." *United States v. Meyer*, 810 F.2d 1242, 1245 (D.C. Cir. 1987). It doesn't refer to "a prosecutor's personal spite or ill will toward an otherwise validly chargeable defendant."

*United States v. Walker*, 514 F. Supp. 294, 311 (E.D. La. 1981); *see* Doug Lieb, *Vindicating Vindictiveness: Prosecutorial Discretion and Plea Bargaining, Past and Future*, 123 Yale L.J. 1014, 1017–1020 (2017) (describing the development of prosecutorial vindictiveness's "particularized" meaning). Indeed, vindictiveness "could hardly be defined so broadly in a legal system that recognizes the legitimacy of retribution as a justification for punishment." *See Walker*, 514 F. Supp. at 311; *cf. People v. Trump Organization, Inc.*, No. 451685/2020, 2022 WL 489625, at \*4 (N.Y. Sup. Ct. Feb. 17, 2022) ("As has often been said, that a prosecutor dislikes someone does not prevent a prosecution").[19] Instead, vindictiveness refers to something narrower: prosecutorial action "whose objective is to penalize a person's reliance on his legal rights." *Bordenkircher*, 434 U.S. at 363.

A vindictive-prosecution defense "typically, if not exclusively" applies in an even narrower context. *See United States v. Lazzaro*, No. 21-CV-0173 (PJS/DTS), 2022 WL 17417970, at \*6 (D. Minn. Oct. 12, 2022), report and recommendation adopted, No. 21-CR-0173 (PJS/DTS), 2022 WL 16948157 (D. Minn. Nov. 15, 2022). It does not "typically involve retaliation for the exercise of just *any* legal right." *Id.* Instead, it involves retaliation for asserting a right during the criminal proceeding itself or a subsequent criminal proceeding.[20] Some courts' description of the defense

---

[19] Of course, the Justice Manual prohibits a government attorney from deciding whether to prosecute an individual based on "[t]he attorney's own personal feelings concerning the person [or] the person's associates." Justice Manual § 9-27.260, Initiating and Declining Charges – Impermissible Considerations, https://www.justice.gov/jm/jm-9-27000-principles-federal-prosecution#9-27.260.

[20] To be clear, "the decision to prosecute" may not be based on the defendant's "exercise of protected statutory or constitutional rights." *See Wayte*, 470 U.S. at 608. And the First Amendment "prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). So a defendant can surely raise such a defense. But that defense is appropriately reviewed in the framework of a *selective*-prosecution defense, a related yet distinct defense. In fact, the existence (Continued)

explicitly keeps to this narrowed scope. *See, e.g., Safavian*, 649 F.3d at 692; *United States v. Raymer*, 941 F.2d 1031, 1040 (10th Cir. 1991) ("When a defendant exercises constitutional or statutory rights in the course of criminal proceedings, the government may not punish him for such exercise without violating due process guaranteed by the federal Constitution."). Under this narrowed scope, for example, a defendant could show vindictiveness where a prosecutor brings more serious charges against a defendant solely because the defendant successfully exercised his right to appeal. *See Blackledge*, 417 U.S. at 28–29.

Yet a vindictive-prosecution defense grounded in the defendant's exercising a right unconnected to the criminal proceeding—*e.g.*, "exercising his First Amendment free speech rights" before any prosecution begins—is "dubious at best." *See Lazzaro*, 2022 WL 17417970, at *5, *6. In fact, as far as the government is aware, the Fourth Circuit has never held that a prosecution was vindictive based on a claim that the prosecutor retaliated against the defendant's exercise of a right unconnected to the criminal proceeding or a subsequent criminal proceeding. *Cf. United States v. Woods*, 305 F. App'x 964, 966 (4th Cir. 2009) (recognizing that "most successful vindictive prosecution claims involve retaliatory prosecutions" after a defendant went to trial).

That said, the Court need not decide whether the vindictive-prosecution defense is strictly confined to its ordinary application. Given that the defendant's exercise of a protected right is attenuated from this criminal proceeding, the Court should fully hold him to his "heavy burden" by carefully considering whether he has produced direct evidence that the prosecution was brought

---

of the selective-prosecution defense seems to reinforce the view that the vindictive-prosecution defense is concerned only with prosecutorial action "that is designed to penalize a defendant for invoking any legally protected right available to a defendant during a criminal prosecution." *United States v. Safavian*, 649 F.3d 688, 692 (D.C. Cir. 2011) (quoting *Maddox v. Elzie*, 238 F.3d 437, 446 (D.C. Cir. 2001)).

for the purpose of punishing him for exercising a protected right.  *See Wilson*, 262 F.3d at 316.

Even if the defense could apply, the defendant has not carried that burden.  He has not produced

direct evidence that he is being prosecuted in retaliation for the exercise of First Amendment rights.

Again, he primarily cites the President's social-media posts.[21]  And again, no post asks for

the defendant to face retaliation for exercising a right.

To the contrary, the President's posts create a years-long record of *legitimate* prosecutorial

motive.  In his posts, the President repeats his views that the defendant committed "crimes," *see,*

*e.g.*, Def. Mem., Dkt. No. 59-4 at 3; that he "leaked information and laundered it through a

professor at Columbia Law School," *see id.* at 16; that he "lie[d] under oath to Senator G," *see id.*

at 6; and that he is "guilty as hell," *see id.* at 56.  None of the posts say that a prosecution should

be brought as punishment for the defendant's exercise of First Amendment rights.  And it would

---

[21] Beyond the President's social-media posts, the defendant cites two pieces of evidence.  First, he cites a news-media report to claim that "during his first term, President Trump openly discussed deploying the IRS against Mr. Comey because Mr. Comey was writing critically about him."  *See* Def. Mem., Dkt. No. 59 at 20 (citing Michael S. Schmidt, *Trump Wanted I.R.S. Investigations of Foes, Top Aide Says*, N.Y. Times (Nov. 13, 2022), http://perma.cc/G2FL-7HCQ).  To start, the President denied this allegation.  *See* Schmidt, *supra*, at 3.  But even if the allegation were true, an IRS investigation is not an indictment for lying to or obstructing Congress, so any alleged statements about an IRS investigation is not "direct evidence" of a motive for this prosecution. *See Wilson*, 262 F.3d at 314.

Second, he cites the President's statement when revoking former CIA Director John Brennan's security clearance.  *See* Def. Mem., Dkt. No. 59 at 20 (citing Statement on the Revocation of the Security Clearance of Former Director of the Central Intelligence Agency John O. Brennan, 2009 Daily Comp. Pres. Doc. 201800534 (Aug. 15, 2018), https://perma.cc/TW4F-JQ6J).  In the statement, the President stated that he was "evaluating action with respect to" the current or future clearances of other individuals, including the defendant.  *See* Statement on the Revocation of the Security Clearance of Former Director of the Central Intelligence Agency John O. Brennan, https://perma.cc/TW4F-JQ6J, at 1. Like the allegation that the President requested an IRS investigation into the defendant, however, this security-clearance review is unrelated to the instant prosecution, so it cannot provide "direct evidence" of a motive for this prosecution.  *See Wilson*, 262 F.3d at 314.

take a contrived reading of the posts to infer such an improper vindictive motive. Even then, however, an inference is not "direct evidence." *Wilson*, 262 F.3d at 314; *see Direct Evidence*, Black's Law Dictionary (12th ed. 2024) ("Evidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption"). So it cannot discharge the defendant's burden to establish an improper vindictive motive.

In sum, the defendant doesn't allege that the U.S. Attorney personally harbored "genuine animus." *Wilson*, 262 F.3d at 314. And he has failed to establish that the President displaced the U.S. Attorney as the "ultimate decision-maker." *See Gomez-Lopez*, 62 F.3d at 306. Or that the President—in any relevant sense—harbors "genuine animus" that could be imputed to the U.S. Attorney. His motion to dismiss and request for discovery should be denied.

### 2.    The defendant has not shown that the prosecution was brought solely to punish him for exercising his First Amendment rights.

Even if the Court finds "genuine animus," the Court should still hold that the defendant is not being vindictively prosecuted because the record establishes that the prosecution was not brought solely to punish the defendant's exercise of First Amendment rights.

To prove causation, the defendant must show that his charges "were brought solely to 'penalize'" him for exercising a protected right.[22] *See Goodwin*, 457 U.S. at 380 n.12. He argues

---

[22] When discussing the vindictive-prosecution defense, the Supreme Court has used sole-causation language. *See Goodwin*, 457 U.S. at 380 n.11 (noting that a "charging decision does not levy an improper 'penalty' unless it results *solely* from the defendant's exercise of a protected legal right" (emphasis added)) & n.12 (same); *see also Bordenkircher*, 434 U.S. at 373 (Powell, J., dissenting) ("Implementation of a strategy calculated solely to deter the exercise of constitutional rights is not a constitutionally permissible exercise of discretion"). For its part, the Fourth Circuit has variously described the causation requirement. Sometimes it says but-for causation. *See Wilson*, 262 F.3d at 314 (requiring a defendant to show that he "would not have been prosecuted but for that animus"). Other times it says sole causation. *See id.* at 316 (requiring a defendant to show that the prosecutor "pursued the … prosecution solely to punish" the defendant); *see also United States v. Doty*, 832 F. App'x 174, 180 (4th Cir. 2020) ("In other words, the charges must be brought solely (Continued)

that he can prove causation by pointing to the "sequence of public events." Def. Mem., Dkt. No. 59 at 24. To the contrary, the sequence of public events forecloses a finding that his indictment was brought solely to penalize him. And his "smoking-gun evidence," *id.* at 23—the President's September 20 social-media post—instead reflects legitimate prosecutorial motive and thus removes any doubt that the prosecution "could not be justified as a proper exercise of prosecutorial discretion." *Goodwin*, 457 U.S. at 380 n.12.

The defendant argues that he's being prosecuted to punish him for being a "[v]ocal [c]ritic of President Trump." Def. Mem., Dkt. No. 59 at 11. Yet according to his own version of events, the earliest that he "spoke out on public and political issues" was June 8, 2017. *Id.*; *see* Def. Mem., Dkt. No. 59-4 at 2 (pinning the earliest exercise of the defendant's First Amendment rights to criticize the Trump Administration to a *New York Times* article published on June 8, 2017). By that point, however, the President had already accused him of committing a crime. On May 21, 2017, less than three weeks after the defendant first testified that he never "authorized anyone at the FBI to be an anonymous source in news reports about the Trump investigation or the Clinton investigation," Def. Mem., Dkt. No. 59-2 at 4, the President publicly accused him of giving "false or misleading testimony," Def. Mem., Dkt. No. 59-4 at 2. That accusation of criminal conduct was mounted before the defendant first stepped into his self-described role as a vocal critic of the President. And that "sequence of public events" should disabuse any notion that the defendant is being punished for exercising his First Amendment rights. *See Wilson*, 262 F.3d at 317 (reasoning

———————————

to penalize the defendant." (quotation marks omitted)). Yet even when articulating a but-for-causation standard, the Fourth Circuit has cited the Supreme Court's sole-cause language. *See Wilson*, 262 F.3d at 314 (citing *Goodwin*, 457 U.S. at 380 n.12). Therefore, the defendant must show that animus is the sole cause of the charging decision. But his argument fails under either standard.

that a defendant's "theory on proving causation" will be "belied by the record" if the government's "efforts to prosecute [him] *preceded*" his exercise of a protected right).

But even if the defendant's exercise of a protected right had preceded the accusation that the defendant committed a crime, he still couldn't show that his charges "were brought solely to 'penalize'" him. *See Goodwin*, 457 U.S. at 380 n.12. In this regard, this case is quite unlike other vindictive-prosecution cases. Typically, a defendant exercises a protected right during a criminal proceeding, the government then takes some prosecutorial action, and the court is left to assess whether the government's action could be justified as a "proper exercise of prosecutorial discretion." *See Goodwin*, 457 U.S. at 380 n.12. Here, the President's social-media posts created a real-time record of legitimate prosecutorial motive long before the government took the prosecutorial action. And that's no less true in the President's September 20 post stating that the defendant is "guilty as hell." *See* Def. Mem., Dkt. No. 59-4 at 56. The defendant's charges can indeed be justified as a "proper exercise of prosecutorial discretion." *See Goodwin*, 457 U.S. at 380 n.12. Therefore, even if the Court finds "genuine animus," the defendant cannot establish that his charges were brought "solely to 'penalize'" him for exercising a protected right. *See id.*

**B.    The government is not selectively prosecuting the defendant.**

The defendant bears the burden of proving selective prosecution by providing clear evidence of discriminatory effect and discriminatory purpose. He has shown neither.

The decision to prosecute is "presumed to be motivated solely by proper considerations" in the absence of "a substantial showing to the contrary." *Hastings*, 126 F.3d at 313. So "[a] criminal defendant bears a heavy burden in proving that he has been selected for prosecution in contravention of his constitutional rights." *Id.* A defendant raising a selective-prosecution claim must show that a discriminatory purpose motivated the government to adopt a prosecutorial policy

with a discriminatory effect. *United States v. Venable*, 666 F.3d 893, 900 (4th Cir. 2012). That means "(1) that similarly situated individuals . . . were not prosecuted, and (2) that the decision to prosecute was invidious or in bad faith." *Olvis*, 97 F.3d at 743 (citation modified). The defendant cannot meet that burden by shifting to the government "the onus of dispelling a presumption of discrimination." *Id.* at 746. Instead, he must present "clear evidence" to support his claim. *Id.* at 743 (quoting *Armstrong*, 517 U.S. at 465). The standard is "demanding" and "rigorous." *Id.*

"[T]he standard for obtaining discovery in support of a selective prosecution claim is only slightly lower than for a dismissal of the indictment." *Venable*, 666 F.3d at 900. The defendant must produce "some evidence" making a "credible showing" that (1) similarly situated individuals were not prosecuted and (2) the decision to prosecute was invidious or in bad faith. *Id.* Again, the evidentiary threshold is a "rigorous one, intended to be a significant barrier to the litigation of insubstantial claims." *Hastings*, 126 F.3d at 314 (quotation marks omitted).

### 1.    The defendant has not shown a "direct admission of discriminatory purpose."

The Supreme Court has declined to address whether a defendant must prove discriminatory effect "in a case involving direct admissions by prosecutors of discriminatory purpose." *Amstrong*, 517 U.S. at 469 n.3 (citation modified). The Court need not reach that question here. Evidence that only "*suggests* discrimination, leaving the trier of fact to *infer* discrimination based on the evidence, by definition," is not direct evidence. *Earley v. Champion Intern. Corp.*, 907 F.2d 1077, 1081–82 (11th Cir. 1990) (employment discrimination case); *see Naficy v. Ill. Dep't of Hum. Servs.*, 697 F.3d 504, 512 (7th Cir. 2012) (retaliation case); *see also Direct Evidence*, Ballentine's Law Dictionary (3d ed. 1969). Neither is evidence that is "subject to more than one interpretation." *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997). There is no "direct admission" that the President instructed anyone to indict the defendant in retaliation for the exercise of First

Amendment rights, much less that he was indicted for such an impermissible purpose. *See supra* at 22, 26–27.

The defendant argues that the President's September 20 social-media post is "a direct admission of discriminatory purpose to single out a perceived political enemy for prosecution." *See* Def. Mem., Dkt. No. 59 at 26. That claim requires a series of inferential leaps, foreclosing a finding of direct admission.

First, the Court must accept the defendant's assertion that for years the President has sought to punish him "because of overt hostility to Mr. Comey's protected speech and because of his personal bias against Mr. Comey," Def. Mem., Dkt. No. 59 at 28, not because the President believes he lied to Congress about actions he took while serving in the President's Administration. As explained, *supra* at 22, 26–27, the record doesn't support the defendant's urged inference. And there is certainly no direct admission making it.

Next, the Court must accept the defendant's claim that "no career or appointed prosecutor had ever agreed" to prosecute the defendant. *Id.* For this, the defendant provides only news reports relying on anonymous sources. But "[a]n anonymous source . . . is certainly not 'clear evidence' of anything," *United States v. Biden*, 729 F. Supp. 3d 410, 420 (D. Del. 2024), much less a direct admission.

Then, the Court must accept the multi-part claim that the September 20 post directed the Attorney General to "oust[]" interim U.S. Attorney Erik Siebert and appoint the current U.S. Attorney because it was "the only way to achieve 'JUSTICE' against" the defendant. Def. Mem., Dkt. No. 59 at 28. But the post is not a direct admission that Mr. Siebert was "oust[ed]" to make way for the current U.S. Attorney to prosecute the defendant. According to one of the defendant's cited news reports (which, like the others, relies only on anonymous sources), Mr. Siebert had

31

resigned the day before, and it was "primarily over the allegations surrounding the New York attorney general," not the defendant's case. Jeremy Herb, et al., *Inside the seven tumultuous days that led to the James Comey indictment*, CNN (Sept. 28, 2025).[23] The post also undermines the suggestion that the President planned to push out Mr. Seibert and replace him with the current U.S. Attorney because she was not recommended until after he vacated office.

Finally, the Court must leap with the defendant from the appointment of the U.S. Attorney to his indictment. Yet he provides no evidence at all about how the case came to be indicted after her appointment or showing her decision to prosecute him "was not based on a good-faith application of law to facts." Def. Mem., Dkt. No. 59 at 28–29. He provides no direct admission that the U.S. Attorney was appointed because she would indict him or that her decision to indict him resulted from discriminatory intent. He asks the Court to accept as fact his pure speculation, which flies in the face of the presumption of regularity.

The defendant spins a tale that requires leaps of logic and a big dose of cynicism, then he calls the President's post a direct admission. There is no direct admission of discriminatory purpose. To the contrary, the only direct admission from the President is that DOJ officials decided whether to prosecute, not him. *See Gangitano, supra* at 17. Without a direct admission of discriminatory purpose, the defendant must identify similarly situated individuals who were not prosecuted and produce clear evidence that the decision to prosecute him was invidious or in bad faith. *Venable*, 666 F.3d at 900.

### 2.    The defendant fails both prongs of the selective-prosecution test.

The defendant has not produced the "clear evidence" required for dismissing an indictment based on selective prosecution. He has not even made the "credible showing" needed for

---

[23] https://perma.cc/4VP7-86ZV.

discovery. He has not identified similarly situated individuals who were not prosecuted or provided evidence that the decision to prosecute him was made because of his protected activities.

### a. The defendant has not identified similarly situated individuals who were not prosecuted.

The defendant has not presented clear evidence—or even made a credible showing—that similarly situated individuals were not prosecuted. He has not carried his "substantial evidentiary burden" of obtaining either dismissal of the indictment or discovery. *See Hastings*, 126 F.3d at 315–16.[24]

"[D]efendants are similarly situated when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." *Olvis*, 97 F.3d at 744. Courts must consider "all relevant factors" in determining whether persons are similarly situated, including "the strength of the evidence against a particular

---

[24] The defendant argues that he can raise a "class of one" selective-prosecution claim by showing he was "'treated differently than someone who is *prima facie* identical in all relevant respects.'" Def. Mem., Dkt. No. 59 at 27, 29. But the class-of-one equal-protection theory "presupposes that like individuals should be treated alike, and that to treat them differently is to classify them in a way that must survive at least rationality review." *Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 605 (2008). The Supreme Court has applied the theory when there was "a clear standard against which departures, even for a single plaintiff, could be readily assessed." *Id.* at 602–03. It is a poor fit in the prosecutorial discretion context. *United States v. Moore*, 543 F.3d 891, 901 (7th Cir. 2008).

"To treat like individuals differently in this context, even without a strictly rational justification, 'is not to classify them in a way that raises equal protection concerns.'" *Id.* (quoting *Engquist*, 553 U.S. at 605). "[T]he discretion conferred on prosecutors in choosing whom and how to prosecute is flatly inconsistent with a presumption of uniform treatment" that undergirds the class-of-one theory. *Id.*

In any event, the class-of-one theory requires the defendant to plausibly demonstrate that he was "treated differently from others who were similarly situated and that the unequal treatment was the result of discriminatory animus." *SAS Assoc. 1, LLC v. City Council for Chesapeake*, 91 F.4th 715, 720 (4th Cir. 2024) (quotation marks omitted). He must show "an extremely high degree of similarity" between himself and his comparators. *Id.* at 722. As explained, he has not done so.

defendant," "the defendant's role in the crime," and "prosecutorial priorities for addressing specific types of illegal conduct." *Olvis*, 97 F.3d at 744. The relevant factors should not be analyzed "in a mechanistic fashion" because weighing them—and making decisions based on them—requires "the very professional judgment that is conferred upon and expected from prosecutors in discharging their responsibilities." *Venable*, 666 F.3d at 901 (citation modified).

The defendant identifies four individuals he claims are "*prima facie* identical" to him "in all relevant respects." Def. Mem., Dkt. No. 59 at 32. But these four are not similarly situated. Unlike the defendant, none is alleged to have lied to Congress about actions he took while serving as the head of an Executive Branch agency.

The defendant alleges Jeff Sessions misled Congress about contacts he made as a campaign surrogate in 2016, not about actions he took as Attorney General. Def. Mem., Dkt. No. 59 at 30–31. He alleges Scott Pruitt made false statements about his use of a personal email account while he was the Oklahoma Attorney General, not while he was Environmental Protection Agency Administrator. *Id.* at 31. He alleges Tom Price made false statements about a stock purchase he made before he was Secretary of Health and Human Services. *Id.* at 31–32. And he alleges Steve Mnuchin made false statements about the conduct of a bank he ran before he was Treasury Secretary. *Id.* at 32.

The four comparators allegedly made misleading statements during their confirmation hearings about actions they took before serving as agency heads. The defendant, by contrast, knowingly made a false statement *about his official conduct* and obstructed Congressional

34

oversight of the FBI's actions under his watch. The proposed comparators are not "similarly situated."[25]

There is a history of prosecuting high-level Executive Branch officials who have lied to Congress about their official actions. *Cf. United States v. Joya-Martinez*, 947 F.2d 1141, 1145 (4th Cir. 1991) (noting defendant failed to show whether the government "ha[d], even once, deferred prosecution" of a similarly situated individual). Assistant to the President H.R. Haldeman, Assistant for Domestic Affairs to the President John Ehrlichman, and others were charged with making false statements to Congressional and FBI investigators related to the Watergate scandal. *See United States v. Haldeman*, 559 F.2d 31 (D.C. Cir. 1976). Secretary of Defense Caspar Weinberger was charged with obstruction and making false statements to a Senate Committee related to his involvement in the Iran-Contra affair. *See United States v. Weinberger*, No. 92-cr-0416, 1992 WL 700245 (D.D.C. Oct. 30, 1992). So was Central Intelligence Agency Deputy Director of Operations Clair George. *United States v. George*, No. 91-cr-0521, 1992 WL 121381 (D.D.C. May 18, 1992). And General Services Administration Deputy Chief of Staff David Safavian was charged with obstructing a Senate investigation after making false statements about his dealings with a lobbyist. *Safavian*, 649 F.3d 688.

It is hardly surprising that the Executive would prioritize the prosecution of high-level agency officials who have lied to Congressional investigators about their official actions. The United States is "a government of laws, and not of men." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803). "No officer of the law may set that law at defiance with impunity." *United States*

---

[25] The comparators are further distinguishable because, contrary to the defendant's claim, they were not all "serving in similar roles" as the defendant when the alleged false statements were made. *See* Def. Mem., Dkt. No. 59 at 32. The comparators all made their challenged statements before they were confirmed.

*v. Lee*, 106 U.S. 196, 220 (1882).  Instead, "[a]ll the officers of the government, from the highest to the lowest, are creatures of the law and are bound to obey it."  *Id.*  It is an obvious "distinguishable legitimate prosecutorial factor[]" that the defendant, unlike the comparators, lied to Congress about (and obstructed its investigation into) actions he took while serving as the head of an Executive Branch agency.  *See Olvis*, 97 F.3d at 744.  In fact, it is arguably the most legitimate prosecutorial factor.  And it justifies making a different prosecutorial decision.

The defendant has not presented evidence that he has been treated differently from anyone else who lied to Congress about official actions they took while serving as an agency head, regardless of whether they were outspoken critics of the President.  That showing "is an 'absolute requirement.'"  *United States v. Lindh*, 212 F. Supp. 2d 541, 565 (E.D. Va. 2002) (quoting *Armstrong*, 517 U.S. at 467).  And without it, he "has not satisfied what is supposed to be a substantial evidentiary burden."  *Hastings*, 126 F.3d at 315–16.  The Court's analysis of the selective-prosecution claim should end here.

### b.    The defendant has not shown discriminatory intent.

Even if the defendant could show discriminatory effect, his claim would fail because he has not shown "that the decision to prosecute him was invidious or in bad faith."  *Venable*, 666 F.3d at 903.  He has not provided clear evidence—or even made a credible showing—that the government acted "at least in part *because of*, not merely in spite of," his protected activities.  *Id.* (citation modified).

The defendant effectively argues that he has proven discriminatory intent by proving discriminatory effect.  He claims that his proposed comparators were not prosecuted because they are the President's "political allies," while he is an "outspoken critic."  Def. Mem., Dkt. No. 59 at 34.  Accepting his characterizations, all they show is that the proposed comparators do not share

his protected characteristic: that he has exercised his First Amendment right to criticize the President. Assuming the comparators were otherwise similarly situated (and they are not, *supra* at 34–35), this difference would establish discriminatory *effect*. *See Hastings*, 126 F.3d at 315 ("A defendant must show that similarly situated persons outside of the constitutionally protected class are not being prosecuted"). But discriminatory effect does not show discriminatory intent. If it did, the two-prong selective-prosecution test would collapse into one. Instead, the defendant must present "clear evidence" that the government acted "at least in part *because of*" his protected activities. *Venable*, 666 F.3d at 900, 903 (emphasis added). All he provides is speculation.

Nothing the defendant identifies "actually state[s]" that his political activity "is the reason for pursuit of the case against him." *See Hastings*, 126 F.3d at 314. Assuming that the relevant intent here is the President's, not the indicting U.S. Attorney's, the defendant has not shown that the President directed his prosecution in retaliation for his exercise of First Amendment rights or because of some personal animus on the President's part.[26] *See supra* at 22, 26–27. The defendant asks the Court to infer from the President's social-media posts and the timeline of the indictment that he is being selectively prosecuted because of the President's personal or retaliatory animus. *See* Def. Mem., Dkt. No. 59 at 23, 35. But the President's social-media posts consistently express his position that the defendant should be prosecuted for his criminal activity: he gave "false or misleading testimony," Def. Mem., Dkt. No. 59-4 at 2, he "leaked CLASSIFIED INFORMATION to the media," which is "so illegal!", *id.* at 3, and he "lied to Congress under OATH," *id.* at 6. As for the timeline, "[d]iscriminatory purpose cannot be inferred from a recitation of historical facts that merely provide context for criminal charges." *Lindh*, 212 F. Supp. 2d at 567; *see also Biden*,

---

[26] As with the vindictive-prosecution claim, the defendant has not shown that the President's intent should be imputed to the U.S. Attorney or even tried to show that the U.S. Attorney acted with discriminatory intent. *Supra* at 22–23.

729 F. Supp. 3d at 423 ("But suspicion based on temporal proximity is not 'clear evidence' of discriminatory purpose, particularly where there are non-discriminatory reasons to explain the government's decision.").    The Fourth Circuit—and the constitutional separation of powers principles underpinning the presumption of regularity—demand more.

*Hastings* is instructive.  *See Hastings*, 126 F.3d at 314.  There, the defendant based a selective-prosecution claim on investigative-agency documents describing him "as a prominent businessman, an active Republican, and someone with connections to certain Republican candidates for office."  *Id.*  The Fourth Circuit held there was no information aside from the defendant's "own interpretation of the referral forms" to support a finding that he was prosecuted because he was a Republican.  *Id.* at 315.  "[N]one of the memoranda actually state[d] that Hastings' political affiliation [was] the reason for pursuit of the case against him" and "his party affiliation was never described as a reason for the prosecution."  *Id.* at 314.  The agent who mentioned his political connections "did not say that those connections had anything to do with the decision to refer the case for criminal investigation."  *Id.*  In fact, she provided several other reasons for the decision to prosecute.  *Id.*

So too here.  The defendant identifies no evidence "actually stat[ing]" that he is being prosecuted because he has criticized the President or because the President holds personal animus. Instead, he provides dozens of posts spanning years that show the President wants him to be held accountable for lying to Congress under oath about his official actions as FBI Director.  *See generally* Def. Mem., Dkt. No. 59-4.  Beyond that, he presents nothing but speculation and innuendo.

Having failed to present clear, objective evidence of discriminatory intent, the defendant relies on pre-*Armstrong* cases to assert that the government's "decision to bypass its normal

prosecutorial process" shows it acted with "impermissible purpose."  Def. Mem., Dkt. No. 59 at 35.  The law does not support his claim.

He cites *United States v. Greene*, 697 F.2d 1229 (5th Cir. 1983), as holding that "where the 'government ha[s] followed unusual discretionary procedures in deciding to prosecute,' courts have regularly concluded that the prosecution is based on an impermissible purpose."  Def. Mem., Dkt. No. 59 at 35.  But *Greene* did not find "unusual discretionary procedures" had been used or hold that such procedures would show an impermissible purpose.

And although the defendants in *United States v. Steele*, 461 F.2d 1148 (9th Cir. 1972), and *United States v. Falk*, 497 F.2d 616 (7th Cir. 1973) (en banc), made a prima facie showing of selective prosecution, both were decided before *Armstrong*.  So was *United States v. Haggerty*, 528 F. Supp. 1286, 1293 (D. Colo. 1981), which incorrectly opined that "the government's failure to follow its normal prosecutorial procedures mandates stricter judicial scrutiny of the prosecution."[27]  *Armstrong* has since made clear that the presumption of regularity supports prosecutorial decisions unless the defendant presents "clear evidence" of both discriminatory effect and discriminatory intent.  517 U.S. at 464–65.  A deviation from discretionary procedures cannot meet that bar.  The defendant's pre-*Armstrong* cases are not persuasive.

Instead, the Court should follow another court in this district, which rejected as "a complete *non sequitur*" the inference "that the involvement of high-level officials in the prosecution decision means that the decision was infected with discriminatory animus."  *Lindh*, 212 F. Supp. 2d at 568. Even assuming the President, Attorney General, or other high-level officials were involved in the decision to prosecute the defendant, it does not mean that they had a discriminatory purpose or

---

[27] No court has relied on *Haggerty*'s selective-prosecution analysis since 1984, well before *Armstrong* was decided.  *See United States v. Hoover*, 727 F.2d 387, 389 n.3 (5th Cir. 1984).

intent. *Id.* at 567–68. Indeed, given the nature of the allegations lodged against a former Executive Branch agency head, "it would have been surprising had the highest-level officials not been involved in the decision to prosecute." *See id.* at 568.

The defendant's extraordinary conduct—and the level of public trust he betrayed by lying to Congress about his official actions—"are manifestly the reasons for his prosecution." *See Lindh*, 212 F. Supp. 2d at 567. The Executive cannot be expected to ignore agency heads lying about official actions simply because they later become outspoken critics. And defendants exercising First Amendment rights "cannot talk themselves into immunity from prosecution for otherwise illegal activities." *See Greene*, 697 F.2d at 1236. Given the defendant's flagrant violation of the public trust, "there is every reason to believe that [he] would have been prosecuted" even were he not a critic of the President. *See Lindh*, 212 F. Supp. 2d at 567. As the President said, "It's about justice, not revenge. It's about justice." Jon Haworth, et al., *Trump applauds James Comey indictment: 'It's about justice, not revenge'*, ABC News (Sept. 26, 2025).[28] There is no discriminatory intent.

\* \* \*

The defendant's vindictive- and selective- prosecution claims fall short of the Supreme Court's "demanding" standard for dismissing a prosecution and the "correspondingly rigorous standard for discovery in aid of such" claims. *See Armstrong*, 517 U.S. at 463, 468. His motion to dismiss and request for discovery should be denied.

## III.    REMEDY

---

[28] https://abcnews.go.com/US/justice-america-trump-applauds-indictment-dirty-cop-james/story?id=125958551.

Should the Court find the indictment was unconstitutionally vindictive or selective, the appropriate remedy would be a dismissal without prejudice. Because "[t]he dismissal of an indictment altogether clearly thwarts the public's interest in the enforcement of its criminal laws" in a "profound and lasting way," a court may not dismiss an indictment with prejudice based on prosecutorial misconduct without first finding the defendant was prejudiced. *United States v. Derrick*, 163 F.3d 799, 807 (4th Cir. 1998). That is true even where the court finds a "deliberate" violation or "egregious" prosecutorial misconduct, neither of which is present here. *United States v. Ronald Lee*, 906 F.2d 117, 120 (4th Cir. 1990); *United States v. Chamberlain*, 225 F.3d 655, at *2 (4th Cir. 2000) (Table).

None of the defendant's arguments for dismissal with prejudice warrant such a "harsh remedy." *See United States v. Goodson*, 204 F.3d 508, 514 (4th Cir. 2000). First, he argues the government violated due process, equal protection, and the First Amendment.[29] Def. Mem., Dkt. No. 59 at 36. But it is not enough to show an error occurred. He must show he suffered prejudice. *Derrick*, 163 F.3d at 807.

Attempting to meet that burden, he argues that he "would not have been indicted, and the statute of limitations on his alleged offenses would have expired," if not for the alleged misconduct that resulted in the appointment of the U.S. Attorney. Def. Mem., Dkt. No. 59 at 37. There was no misconduct. But more importantly, there is not a shred of evidence proving that the defendant "would not have been indicted" absent the President's September 20 social-media post and the

---

[29] The defendant also argues the government committed "a separate and independent willful violation" by unlawfully appointing the U.S. Attorney, who then conducted grand jury proceedings. Def. Mem., Dkt. No. 59 at 36 & n.11. As explained in the contemporaneously filed response in opposition to the motion challenging the U.S. Attorney's appointment, those claims are baseless.

U.S. Attorney's appointment.  *See supra* at 32.  Rank speculation cannot suffice for a showing of prejudice.

He then argues that dismissal without prejudice would "reward the government for its last-minute" appointment of the U.S. Attorney and "consequent manipulation of the statute of limitations."  *Id.* at 37 (emphasis omitted).  Again, he has provided no evidence about how the case came to be indicted after the U.S. Attorney's appointment or showing her decision to prosecute him was made in anything other than good faith.  *See supra* at 32.  He has not even tried to argue that she held an improper bias.  *See* Def. Mem., Dkt. No. 59 at 21.  And he has not explained how the government "mainpulat[ed]" the statute of limitations by indicting him before the statute ran.

Finally, he asserts that dismissal without prejudice would be an "affront to the integrity of the criminal justice system."  *Id.* at 38.  The true affront to the criminal justice system would be to allow the defendant to escape accountability for lying to and obstructing Congress under oath about actions he took while serving as the Director of the Federal Bureau of Investigation.  The indictment was presented by a duly appointed and unbiased prosecutor.  And a duly constituted grand jury found probable cause that he committed the indicted offenses.  Dismissing the indictment with prejudice would reach the very result the Fourth Circuit has repeatedly warned courts against:  "thwart[ing] the public's interest in the enforcement of its criminal laws."  *Derrick*, 163 F.3d at 807.  Dismissal with prejudice is unwarranted.

## IV.    CONCLUSION

The prosecution is not vindictive or selective.  And the defendant has not made the rigorous showings necessary for discovery.  The motion to dismiss and request for discovery should be denied.

Respectfully submitted this 3rd day of November, 2025.

LINDSEY HALLIGAN
UNITED STATES ATTORNEY

*N. Tyler Lemons*
_____
N. Tyler Lemons
Assistant United States Attorney
North Carolina Bar No. 46199
Gabriel J. Diaz
Assistant United States Attorney
North Carolina Bar No. 49159
2100 Jamieson Avenue
Alexandria, VA 22314
Tel: (703) 299-3700
tyler.lemons@usdoj.gov
gabriel.diaz@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of November, 2025, I filed the foregoing motion with the Clerk of Court via the CM/ECF system, thereby causing it to be served upon all counsel of record.

Respectfully submitted,

*N. Tyler Lemons*
_____
N. Tyler Lemons
Assistant United States Attorney
North Carolina Bar No. 46199
Gabriel J. Diaz
Assistant United States Attorney
North Carolina Bar No. 49159
2100 Jamieson Avenue
Alexandria, VA 22314
Tel: (703) 299-3700
tyler.lemons@usdoj.gov
gabriel.diaz@usdoj.gov